## SMITH vs. GAGE.

A testator, by his will, gave and devised to J. L. all those parts of certain lots of land in Clinton and Franklin counties (describing them) "which remain unsold or not conveyed by me at the time of my death; *and also* all *contracts* which may have been entered into for the sale of any of the said lands, and which have not been fully paid up, and all *moneys which may remain due and unpaid on such contracts;* and I direct the said J. L. to carry out and perform all such contracts, upon the purchaser's complying with the terms thereof." *Held* that the testator intended to give the land as land, and the contracts as contracts, with a direction to J. L. to hold the title in trust and to execute deeds. And that such contracts were that species of property which the law stamped upon them, viz. personal property; their character not being changed by any thing in the phraseology of the will.

*Held, also,* that the death of the testator severed the title of the real from the personal estate, in the lands and contracts; the title to the real estate going directly to the devisee, and the title to the personal going directly to the personal representative.

*Held, further,* that a judgment recovered against the devisee, prior to the death of the testator, and docketed subsequently to his death, became a lien upon the real estate so devised; but that the judgment creditor could only secure his claim upon the personal estate through the instrumentality of an action in equity in the nature of a creditor's bill, or otherwise, in order to reach the unpaid money due on a contract, then remaining a mere chose in action in the hands of the executor.

That J. L. had no such interest in the lands embraced in a contract for the sale thereof, which had been executed by the testator, as to make them subject to the lien created by the docketing of a judgment against J. L.

That J. L. took such contract only as personal estate; and that the personal property thus coming to him did not merge in, or attach to, the title to the real estate held by him in trust.

That the obligation of the vendee, in such a contract, to pay, was assignable, and was severable from the trust to convey.

And the vendee having complied with the terms of his contract, and received a conveyance of the premises from J. L. in execution of the trust created by the will; *Held* that he was entitled to hold the land, as against one claiming under a judgment docketed against J. L.

The case of *Moyer* v. *Hinman,* (17 *Barb.* 139,) which holds that a judgment regularly docketed against the vendor of lands by an executory contract is a charge upon the land and binds the legal title, is not well supported by authority. (*See S. C.* 13 *N. Y. Rep.* 180.) *Per* POTTER, J.

After the vendee in an executory contract has perfected his title to lands in pursuance of it, an action of *ejectment* will not lie against him by a grantee

Smith *v.* Gage.

of the sheriff by deed under a judgment against the devisee of the vendor, docketed subsequent to such contract, though such judgment was docketed while a portion of the purchase money remained unpaid, and before the vendee received his deed.

THIS action was brought to recover the possession of real estate, and was tried before Justice BOCKES in March, 1862, without a jury. There was no question of fact in the case, to be considered. The exceptions are only to the conclusions of the judge upon his findings of fact. The plaintiff rests his right to recover upon a deed from the grantee of a sheriff, at a sale by him of the interest of John Lamb, under a judgment obtained in the superior court of New York, December 5, 1850, docketed in Franklin county, on the 17th of August, 1855, for $8925.29. The sheriff's sale was made 21st of February, 1856. One Theodore Hinsdale was the purchaser of all the real estate in this patent, under this judgment, and took the sheriff's deed thereof, which included this property. Hinsdale and wife conveyed to the plaintiff the property he so purchased, including the premises in question. The plaintiff, before action, gave notice to the defendants of his claim of title, and demanded the possession. This was the plaintiff's case, except that in order to show title in John Lamb, he produced the will of Anthony Lamb, (who it was conceded was the source of title,) in which is the following clause : "I give and devise to my son John, and to his heirs and assigns forever, in fee simple, all those parts of lot No. 67, of township No. 6, of the military tract, in the county of Clinton, in the state of New York; and also all those parts of lots Nos. 22, 76, 77 and 82 of township No. 7, of said old military tract, in the county of Franklin, in said state, *which remain unsold,* or not conveyed by me at the time of my death; and also *all contracts* which may have been entered into for the sale of any of said lands, and which may not have been fully paid up, and all *moneys which may remain due and unpaid on such contracts;* and I direct the said John to carry out and perform all such

contracts, upon the purchaser's complying with the terms thereof." Anthony Lamb died 13th of May, 1855. The defendant Samuel Gage, in his defense, showed an executory contract from Anthony Lamb to him for the sale of the premises in question, dated 5th November, 1851, by which contract Anthony Lamb agreed, on condition that Gage, his heirs &c., fulfilled the conditions and covenants therein specified, to execute to him, Gage, a warranty deed of the premises. The sixth condition thereof was that Gage was to pay $500 for the premises; $200 down and $300 in four equal annual installments, with interest annually. Gage paid $200 down, and $50 on the 25th September, 1854, thereafter. There were also other covenants in the agreement on the part of Gage, to cultivate, improve, &c. He entered into immediate possession—improved the land—cleared up about thirty acres; built fences and erected a house and log barn. Some of the land is in meadow, and some is plowed. The other defendant, Elijah C. Gage, works the farm, and supports Samuel, who is now eighty years old. John Lamb, on the 12th September, 1835, assigned the several *contracts* made by his father for the sale of lands, including the contract made by his father with Samuel Gage, to one Timothy P. Richards, who by an assignment, dated 15th April, 1859, transferred the same to George C. Lamb. John Lamb, by another assignment made on the 15th April, 1859, assigned this *particular* contract separate from the others, to George Lamb, who, on the 25th June, 1859, assigned the same to one Manly B. Boardman. These assignments were on the back of the original agreement, made by Gage with Anthony Lamb, for the sale of the premises, and purported to transfer the *moneys* due and to become due thereon, and authorized the assignees to sue for and recover the same. John Lamb, on the 12th July, 1859, executed a deed to Samuel Gage of the premises described in said agreement, which deed recited the making of the said contract, and the several assignments thereof, also the last will and testament of his father, An-

thony Lamb, so far as it related to said contract. On the same day, and at the same time and place, Samuel Gage, the defendant, and wife, executed to Boardman, the holder of the said contract, a bond and mortgage upon the same premises for the payment and security of $436.54, the sum due upon the said contract on that day, for principal and interest. By the will of Anthony Lamb, he appointed executors thereof. This, upon the facts, was the defendants' case. The remaining facts sufficiently appear in the opinion.

*J. R. Flanders,* for the plaintiff.

*R. Swinburne,* for the defendant.

POTTER, J. The first question, I think, to be examined in proper order is: Was the interest which John Lamb took in the contract in question, under the will of Anthony Lamb, real or personal estate? But for the labored and elaborate argument on the part of the plaintiff to prove it to be a devise of real estate, I should not have supposed that such was the law, or that such a construction could be claimed. The provisions of this will, in its terms, are certainly clear and intelligible. There is neither latent or patent ambiguity in its language to be explained. In such a case I understand the rule is, that the words are to be used in their ordinary sense, and so that every word and expression shall have some meaning, and each word its full and proper effect; that where a testator thus uses plain and intelligent, or even technical words, he is presumed to employ them in their ordinary, natural and legal sense, unless the context clearly indicates the contrary. In the absence of ambiguous language, there is no occasion to ask the court for any construction as to the testator's intent. That intent is deemed to be such as the legal effect of the language would make it. The language of the clause in the will in question, it appears to me, clearly expresses, in apt and appropriate words, a gift and devise, and an intent to

give and devise in regard to those lands, two kinds of property; and he has left the character of each kind to the determination which the law confers upon it. He gives and devises, *First.* " All those parts of certain lots of land in certain military tracts, in Clinton and Franklin counties in this state, [describing them] *which remain unsold or not conveyed by me at the time of my death.*" About the character of the estate in this portion of the devise, no doubt arises; and it is not in question here. Unsold lands are real estate, and pass directly to the devisee, not subject to the control of the executor. *Second.* The testator then adds, "*And also,* all *contracts* which may have been entered into for the sale of any of the said lands, and which have not been fully paid up." Whatever may be the character of *this* property, clearly it includes the contract in question. A part of the purchase money had been paid, but it had not been fully paid up. As *lands* the testator limited the devise to such as *remained unsold, or* not conveyed. Under the *first,* he designated the property as *lots,* under the *second* as *contracts.* Then, according to the rule of giving every expression full effect, he gives or devises another kind of property, to wit, "all contracts which may have been entered into for the sale of any of said lands, and which have not been fully paid up." In terms he has *distinguished* this kind of property from the other. There can therefore be no doubt that the *contract* in question passed under *this* clause, and not under the former, whether it be a gift of real or of personal estate. But the testator still adds, as if for some further explanation of the reason of using different language in bequeathing the latter, or to remove all doubt as to the effect of giving under the term " *contracts,*" these words : " *And all moneys* which may remain due and unpaid on such contracts." These latter words are a gift of money, and are evidence of a design to give it as money; and as money it also includes the property in this contract, and helps to explain what it was that the testator intended to give under the word *contracts,* thus giv-

ing the word *moneys* a meaning. If this was intended to be real estate, these words "*all moneys*" must be excluded as useless and have no effect. And were it still possible that any thing could be wanting to show that the testator himself intelligently understood the character of the property he was thus disposing of, and what was necessary should be done by John, he finally adds words creating a trust, or power in trust, to John, as follows: "And I direct the said John to carry out and perform *all such contracts,* upon the purchasers complying with the terms thereof." How to comply? By paying the money due. I confess that I have been entirely unable, from this reading of the will, to discover the *intent* of the testator to be as claimed, or to stamp upon this portion of the property any other character than that which the law gives to it. On the contrary, the language of the will forbids any other construction. The testator gave no direction or intimation that he desired these contracts to remain, or be invested in lands, so as to preserve it in that character. If the testator had intended to give John " all the real and personal estate" relating to those lands, it would doubtless have been briefly and more appropriately expressed in those words. It seems to me from the language so carefully employed, that he intended to give the *land* as *land,* and the *contracts* as *contracts,* with direction to John to hold the title in trust, and to execute deeds. Thus reading the will, there is no confusion, and no occasion to ask for any construction of language; it construes itself by the rule of common sense. Given as a contract, what is to be received from it is money, and Story says : " the law presumes the property shall assume the very character of the thing into which it is to be converted, whatever may be the manner in which that direction is given." (*Story's Eq. Juris.* § 791.) These contracts are, then, precisely that character of property which the law stamps upon them ; and this character has not been changed by any thing in the phraseology of the will. What is that character ? In *Lewis* v. *Smith,* (5 *Selden,* 502, 510,) such

property was held to be personal estate. Denio, J. therein uses the following language: " The land had been sold by the testator in his lifetime, and his interest at the time of his death was the right to the money due upon the contracts, and was *personal estate.*" The question arose in that case upon the *devise* to the wife for life, of the whole of the testator's property, real and personal, among which were contracts like the present for the sale of lands. This might be regarded as sufficient authority, being the decision of the highest court in the state, recently declared : nor is this new doctrine. To the same effect is *Moore* v. *Burrows,* (34 *Barb.* 173 ;) *Adams* v. *Green, Id.* 176 ;) 1 *Jarman on Wills,* 147 ; *Story's Eq. Juris.* §§ 1212, 1214, 789, 790, 792 ; *Champion* v. *Brown,* (6 *John. Ch.* 398, 402 ;) *Atcherley* v. *Vernon,* (10 *Mod. R.* 528 ;) *Patterson* v. *Moore,* (3 *Atkyns,* 272 ;) *Griffith* v. *Beecher,* (10 *Barb.* 434 ; 18 *id.* 83.) I have no hesitation, therefore, upon these authorities, in saying that the contract in question to the beneficiary under the will was personal estate. In whom, at the death of the testator, is the title to personal estate ? It is unnecessary to cite authorities to show that from the moment of the death of the testator the title to all the personal estate vests in the executor ; and though he may not *act generally* till probate, yet when probate is had, the title relates back to the death of the testator. By the mere operation of law, which no court can control, the death of Anthony Lamb severed the title of the real from the personal estate in these lands and contracts. The title to the real estate going directly to the devisee, and the title to the personal going directly to the personal representative. By the subsequent docketing of the judgment in question it became immediately and directly a lien upon the real estate so devised, but the judgment creditor could only secure his claim upon the personal estate through the instrumentality of an action in equity in the nature of a creditor's bill or otherwise, in order to reach the unpaid money due on the contract, then remaining a mere chose in action in the hands of the execu-

tor, subject, first, to the payment of the testator's debts, and to the expenses of administration.

Is it at all doubtful that had the executor needed these choses in action to enable him to pay the debts of the testator, he could have collected the moneys due thereon, and have thus applied them? Will it be claimed that he must have applied to the surrogate for permission to sell these contracts as real estate? I think not. Subject to this claim of the executor, the law had furnished the creditor with an appropriate remedy by action to reach the balance. The title to this chose in action—this executory contract—thus coming by operation of law to the personal representative, it is separated from, and unaffected by the trust to convey the title. The executor held this personalty without any interest whatever in the land, and without any privity or reciprocal obligations with the trust to convey, or with Gage, the vendee, but that of creditor and debtor; unless it be that he takes also the equitable lien upon the lands by virtue of the contract, by which he may secure the payment of the balance due thereon, which he may enforce by a suit in equity. (*Sanders* v. *Aldrich,* 25 *Barb.* 71.) This case just cited, is authority also to show, that there may be a severance by the act of the parties to such an executory contract, as well as that by operation of law; the obligation to pay, by the vendee, is assignable, and is severable from the trust to convey. But if the construction of the language of the will made it doubtful in the law of equity, to which character of property, real or personal, it belonged, no one will deny, says Story, "that it is competent for the owner of the fund to make the land money or money land at his sole will and pleasure." (*Equity Juris.* § 791.) John Lamb, the owner of the property so bequeathed, did exercise his option in this regard, by assigning it as personal property. How then, at this period of time in this case, stood the legal relations of the parties to each other? As such we are now to examine it. Unrestrained by judicial interference, and unaffected by the equities which may here-

after be noticed, Gage, the vendee and defendant, was under the legal obligation to pay the moneys due upon his contract to the legal owner and holder thereof. The contract required him to pay it to Anthony Lamb, his heirs, executors, administrators or assigns. This contract, by a succession of assignments, commencing with John Lamb, the devisee or legatee, on the 2d of September, 1853, was regularly, and as appears legally, transferred until it came to the hands of Manly B. Boardman, on the 25th of June, 1859, who then held the same as the assignee thereof. The possession of the contract by John Lamb, the devisee or legatee thereof, on the 12th of September, 1855, with the title given by will, is presumptive evidence that he had received it from the hands of the executor. The assent of the executor is necessary to the due vesting of the title in the legatee. (*Dayton's Surrogate*, 411.) John Lamb could take it from the executor only as personal estate; and each succeeding assignee took the same title from him. The personal property thus coming to John Lamb would not merge in, or attach to, a title to the real estate he held in trust. How then stood the rights of the parties to the contract, that is, the vendor and his assigns, and the defendant? John Lamb, by the provisions of his father's will, took the contract, and also took the legal estate in trust, or as a power in trust, to convey the said lands to the vendee in the contract, in terms as follows, to wit: "I direct the said John to carry out and perform all such contracts upon the purchasers' complying with the terms thereof." This trust remained wholly unaffected by the assignment of the contract or promise. John Lamb had previously disposed of the contract, that is the promise to pay and the moneys due thereon, without covenants or liability over, at the risk of the assignee. The terms as to him (John Lamb) had been complied with; and on the 12th of July, 1859, he executed this trust, by conveying as directed in the will, to Samuel Gage, the defendant, the title to the premises in question. The defendant, Samuel Gage, had complied with the terms of his contract; and he

Smith *v.* Gage.

was entitled to the deed. As to him, there was no equitable lien upon his land when he had paid the purchase money; and Manly B. Boardman took a mortgage from the defendant Gage, to secure $436.54, the amount due on the said contract on that day. A defendant may show as a defense to an action of ejectment brought. by a purchaser at a sheriff's sale, that the interest of the judgment debtor was of such a nature that it could not be sold on execution, and that the plaintiff acquired nothing by the deed from the sheriff. (*Colvin* v. *Baker*, 2 *Barb*. 206.) Thus stood the *legal* rights of the *defendant* Samuel Gage, as they were presented on the trial. How then is it shown that the plaintiff has made out a legal title to these premises authorizing a judgment in his favor? If, as it has been contended, this contract and the money due thereon was a devise of real estate, by reason of the direction to John Lamb to convey the title when the money was paid, it was held in this same case, when before us on a former occasion, per ROSEKRANS, J. "That a devise of lands which the testator has contracted to sell, the possession of which the vendee is entitled to, as well as to the rents and profits thereof, when the devise is accompanied with a direction to the devisee to convey the lands upon the vendee's paying the purchase money, does not transfer the title to the devisee, under our revised statutes." And to this was cited 3 *R. S. 5th ed. p.* 15, § 49; *p.* 16, § 55; *p.* 21, §§ 77, 78. It only creates a special power. (*Id. p.* 24, § 98, *sub.* 1.) A power in trust. (*Id. p.* 25, § 115, *sub.* 1, 2.) This is now the law of this case in this court. If then this devise was of real estate, it was a trust estate, or a power in trust for the *cestui que trust*, and to which a lien of a creditor by judgment against the trustee, would not attach·; and if it was a bequest of *personal* estate, as we think, it is not susceptible of being affected by the lien created by the docket of a judgment. It is insisted that our revised statutes do not make this kind of contracts *assets*, which go to the executor, inasmuch as the provisions of the statute do not specifically embrace them.

(3 *R. S. 5th ed.* 169, § 6.) And that the maxim *expressio unius* &c. excludes them by construction from being that character of property. It is to be remarked that statutes in derogation of the common law are to be strictly construed in this regard; and the common law is not abrogated by mere implication, when both the common law and the provisions of the statute may exist without being repugnant. But the maxim cited, when applicable, applies only to presumptions. *Broom,* in his *Commentaries on Maxims,* 506, says, that "great caution is always requisite in applying this maxim." There is nothing in the words of this statute from which it can be *inferred,* that it was *intended* to change the common law in this particular; but on the contrary, the eighth section of the same act expressly preserves all common law rights from being *impaired* by the prior sixth section; besides, it is a mistake of the counsel to suppose that the sixth section of the statute does exclude this character of property by the omission supposed; true, it does not by that particular specification name "*contracts for the sale of land.*" But such contracts are, undeniably, "things in action." By *that* designation, which is a general term for all contracts, they are specifically mentioned in subdivision 8 of section 6 of the statute referred to. I think this point is not therefore well taken. The remaining point, in fact the only point under which the plaintiff claims to have made title, starting with the assumption that this devise is real estate, is section 4 of 2 *R. S.* 359, (*p.* 637, *vol.* 3, *5th ed.*) which makes all judgments rendered in any court of record binding, and a charge upon the lands, tenements, real estate and chattels real, against every person against whom such judgment shall be rendered, which such person shall have at the time of docketing such judgment, or which such person shall acquire at any time thereafter, and be subject to be sold on execution." It can hardly be denied that if the premises in question were the lands, tenements or real estate of John Lamb, in his own right, at the time of dock-

Smith *v.* Gage.

eting this judgment, the plaintiff has shown legal title, and would be entitled to recover. We have come to the conclusion, as above expressed, that John Lamb had no such interest in the lands in question as to make them subject to a lien by the docket of a judgment against John Lamb. It is true that there is a little confusion created by some modern decisions found in the books, which it seems were at first based upon dicta found in a few equity cases. These were finally collected, and culminated in a direct holding to that effect in a case at law, in *Moyer* v. *Hinman*, (17 *Barb.* 139,) to wit, that a judgment regularly docketed against the vendor of lands by an executory contract, is a charge upon the land, and binds the *legal* title. The following cases are therein cited, as authority for such holding; and are repeated in this case to sustain that doctrine, viz: *Keirsted* v. *Avery*, (4 *Paige*, 15.) *Ten Eick* v. *Simpson*, (1 *Sand. Ch.* 244.) *Opinion of Chan. in Parks* v. *Jackson*, (11 *Wend.* 442,) *and Gouverneur* v. *Lynch*, (2 *Paige*, 300.) Although *Moyer and Hinman* differs from the case before us in this, that John Lamb was not, as in that case, the *vendor* of the property, but only the devisee or legatee of the contract, it is due to the case and to the point we are now considering, and to the authorities cited, that this doctrine be now settled. If this holding in *Moyer and Hinman* is found to be sound, it should be followed; if unsound, its circulation should be checked, or at least limited to its legitimate bounds. Let us review those cases from which this doctrine is taken. *Keirsted* v. *Avery* was not a case of an executory contract, but was an equity suit, brought to set aside a sheriff's sale of the real estate of a defendant in a judgment, upon the ground that such defendant was only a trustee for another, in holding the title to the estate sold, though the principle settled was not unlike this case. All that was decided by the chancellor in that case was that the court would protect the equitable rights of the *cestuis que trust,* and enable the judgment creditor to reach such actual interest by his bill

in equity, as the judgment debtor might have in the land so held in trust, after the equitable interests were satisfied. What the chancellor said in that case is exactly in harmony and not in conflict with our views of equity, and of the remedy of the parties in this case. He said, "although the legal title (in that case) may have been vested in .G. Maxwell (the judgment debtor) by the sale under the "execution, yet it is satisfactorily established that he took it merely as security for his advances, and that he held it in trust," &c.; and the chancellor held that the judgment creditor and purchaser at such sale held it subject to that trust. *Ten Eyck* v. *Simpson* was also an equity action to compel the *grantee* of lands to perform specifically an executory contract made by his grantor. The grantee of the vendor had a deed which was junior in date to the date of the complainant's executory contract for a part of the same lands. The complainant (vendee) being in possession at the date of the defendant's deed. The defendant claimed title by virtue of his conveyance; the complainant having no conveyance. The vice chancellor held the *possession* of the complainant to be notice to the defendant of his right, and that the defendant was to be deemed to have taken the title, to the extent of the complainant's claim as his trustee; and he decreed specific performance. In the vice chancellor's argument in that case he did say, hypothetically, and entirely *obiter*, "If a judgment had been docketed against William (the vendor in the complainant's contract and the grantor in the defendant's deed,) the day after the contract was signed, it would have become a lien to the extent of the unpaid purchase money. Payment to William (the vendor) when the money became due, would not in such case have availed the purchaser." This very careless and unsound dictum of a learned equity judge led to, and perhaps was the principal basis for, the decision of *Moyer* v. *Hinman*, (17 *Barb.* 139,) which has been *in this particular* directly overruled in the same case by the court of appeals, (3 *Kern.* 180,) so the authority of this case is

Smith *v.* Gage.

the other way. The next case cited to establish this doctrine is *Parks* v. *Jackson.* That was an action of ejectment at law, and is in point, because an executory contract was the subject. A remark by the chancellor alone as one of the court of errors, is cited also in support. That remark is as follows: "As the *legal* title alone is in question in the present suit, it is not necessary here to express any definite opinion as to the *legal* lien of a judgment recovered against the vendor in a prior contract of sale upon the unpaid purchase money." Then, after reviewing certain cases in Pennsylvania, Maryland and Kentucky, he adds: "But if a judgment is to be considered in this state a *legal,* as well as an equitable *lien, as I think it is,* I see no difficulty in protecting the equitable rights of the vendee not only against the judgment creditor, but also against the vendor." It is seen that the chancellor spoke hesitatingly on the point. He cited no authority; up to that time none existed in our courts, except that the supreme court in *that* case, had held that payments made by the vendee, to the vendor after filing a *lis pendens,* (which was regarded as equivalent to the docketing of a judgment,) could not be allowed to the vendee; the chancellor holding the lien of a judgment to be the same in effect, upon the legal title, as a *lis pendens,* was for affirming the judgment on that ground. Every other member of the court (twenty in number) were for *reversing;* and it was reversed accordingly. The following syllabus of the case, it appears to me is conclusive, (but not to sustain the chancellor's opinion on the proposition for which it is cited,) viz: "A purchaser under contract who enters into actual possession in pursuance of the terms of his agreement, makes improvements &c., should be made a party to the bill in equity filed to avoid the title of his vendor, so that the court may make such order in the premises as will be just and equitable in reference to the rights of all concerned. If he is not made such party, and a decree is obtained avoiding the title of his vendor and such creditor becomes a purchaser *of the legal*

*estate of his debtor at sheriff's sale under execution on the judgment in his favor, and brings ejectment for the recovery of the land, he is not entitled to recover."* The last case which is cited to sustain *Moyer* v. *Hinman,* in the supreme court, was *Governeur* v. *Lynch.* In looking at this case it will be seen that no question as to the legal effect of a judgment is in the case. It only holds that a subsequent purchaser or mortgagee takes the equitable lien of his grantor. It will be seen in this review, that no well considered case is presented resting upon authority, that sustains the plaintiff's action at law. That his remedy was in equity and *only* there, can I think be maintained by abundant authority. As this is an action at law, only, it might seem to be traveling out of the case to examine what the rights of the parties in equity are; but to maintain the proposition that the plaintiff's relief was in equity *only,* is but another method of showing he has no remedy at law, and has consequently mistaken his form of action; hence a short review may be appropriate. In this review I propose not only to show that the plaintiff's remedy is only in equity, but also that the defendant has such title as will defend him in possession at law, *until equity is tendered to him, by persons coming to claim under titles junior to his,* and that the defendant has not the burthen cast upon him to resort to the court, for the relief which his written contract and possession under it affords him. In *Parks* v. *Jackson,* (11 *Wend.* 456,) Chancellor Walworth, after remarking that the *equitable* rights of parties could not be examined in an ejectment suit; having previously stated that the vendee had such equitable rights; said, ": the remedy was in chancery, where *alone,* the equitable rights could be protected." Senator Seward, in the same case, who delivered the opinion of the whole court except the chancellor, said, page 460, " So no person can be evicted from the possession of lands by the judgment or decree of *any* court, in a cause wherein he was not made a party; *if in possession at the time of the commencement of the suit.* And why? Because he has an interest,

Smith *v.* Gage.

and shall have a day in court to assert it." If this is sound doctrine, and it is the law of the highest court, then, whether the defendant's rights are legal or equitable, he has a good defense to this action. In *Moyer* v. *Hinman*, (3 *Kern.* 184,) Judge Denio shows the condition of such parties in equity to be this. I do not cite verbatim, because the parties there were reversed. "The defendant was the equitable owner in possession, and the plaintiff had notice of his situation, and of his rights ;" and on page 186, speaking of the purchaser's claim at sheriff's sale, he says, "*it was still a lien.*" If this be true, that it was a lien, and not the legal title, no doctrine is better settled than that a person having an equitable lien, or a mortgagee in possession, cannot be evicted by an action at law. (*St. John* v. *Bumpstead*, 17 *Barb.* 100. *Phyfe* v. *Riley*, 15 *Wend.* 253.) Chief Justice Savage, in the last cited case, makes some sound and sensible remarks as to the person upon whom the *burthen* of litigation and action in such case is thrown. Speaking of a mortgagee in possession, he says, " What reason can be given why he should be turned out of possession ? Is it that . *he* may be put to the trouble and expense of foreclosing his mortgage, and then bringing ejectment ? Such surely cannot be the policy of the law ; on the contrary, litigation and expense to parties will be saved by permitting the mortgagee to retain possession until the mortgagor, or those claiming under him, shall institute proceedings in equity for the purpose of redemption." Surely the party who by his sale obtains only a *lien*, and that lien junior to that of the equitable owner, should not be permitted to bring an action at law to enforce such equitable lien, and allowed to override and destroy a prior and better title. I see neither law or equity in this. I have thus attempted to show that the plaintiff's claim is an equitable, and not a legal one, and that the action of ejectment is not the proper remedy.

The court of appeals, in *Heywood* v. *The City of Buffalo*, (14 *N. Y. Rep.* 540,) say : "It is still the law that a party

who brings an equitable action must maintain it upon some equitable ground, and if his cause of action is of a *legal* and not an equitable nature, he must bring a *legal* and not an equitable action, or pursue a legal remedy. If his action is an equitable one, he must state clearly the facts sufficient to entitle him to equitable relief." The case of *Ells* v. *Tousley,* (1 *Paige,* 280,) also is this case in its equitable features, with the parties reversed. It is as if Gage, the defendant, had filed a bill to restrain the plaintiff from attempting to enforce his title at law, by the taking of a sheriff's deed; and the court restrained him. The allegation was, "that the defendant purchased in the property at sheriff's sale with full knowledge of the complainant's rights; and threatens, after the time of redemption expires, to take a sheriff's deed in pursuance of the sale." The chancellor said, "I have lately had occasion to decide that the lien of a judgment does not in equity attach upon the mere legal title to land in the defendant, when the equitable title is in a third person." In *Sanders* v. *Aldrich,* (25 *Barb.* 70,) Johnson, J. says, "I do not admit that an action can be *both* legal and equitable in its character; or either, as the evidence on the trial may turn out to be. Neither the rules of law nor of equity admit of metamorphoses." It finds no countenance in the code. That was a case in its features like the present, growing out of an executory contract, where the trust had been severed, by assignment, from the contract and promise to pay. Speaking of the person who held the legal title, he said: "He holds the legal title in *trust,* until his vendee shall become entitled to it by the performance of the contract." In *Ten Eick* v. *Simpson,* Vice Chancellor Sandford, speaking of the vendee, said: "He had an equitable claim for a deed on paying the stipulated price to William (the vendor) and his assigns. John had become his (William's) 'assigns,' and when the time arrived for the vendee to pay the price of his purchase, he was bound to pay it to John, by the letter of his contract." We need not further pursue the cases in equity, though they

Smith *v.* Gage.

can be multiplied. We have pursued the cases at law without finding one to support it that has not been overruled. I have no hesitation in holding that the remedy is, and in all similar cases should be, in equity. Though the vendee may if he please bring his action in equity, to quiet his title, he is not bound to do so, and may remain until equity is tendered to him. It would be a stange doctrine of equity indeed, that would throw the burthen of litigation upon a bona fide vendee under such circumstances ; or that would fail to protect him when his rights are assailed. What was his position ? He was the purchaser from the owner in fee, of a lot of land. He had paid one half of the purchase money, and was permitted by waiver of time of performance, to remain undisturbed. He had entered into the possession—had made large improvements upon the soil, by the fences, by the erection of buildings—and had largely increased the value of the estate. This increased value of the land by the labor of the defendant was equitably his own property. It was acquired by him in quiet, by the vendor's consent, and while laboring under the honest belief, as in equity he might, that such improvements were for his own benefit. Upon the faithful performance of his contract when called upon, he was entitled to these benefits, and to a deed of the title. In making his contract, he took only the hazard of the vendor's title, and of his responsibility that he was able to perform on his part by giving a deed. It was no part of his contract that he should file bills in equity against *junior* claimants. The contract being assignable, he was bound in law to meet the payments, to the legal owner and holder thereof, by assignment or devise, whosoever that might be, until restrained by judicial action. He ran the hazard of *prior* judgments against his vendor, and was bound to search the records for all incumbrances *prior* to the date of his contract, but he was not bound to search for liens intervening between his purchase and the date of his deed. Subject to these hazards, his possession was notice to all the world of his interest. All sub-

sequent claims acquired by any one against his vendor, or his assigns, are subject to these his prior equities and rights. For what reason, then, should equity impose upon him the burthen of a litigation against *junior* claimants, to secure him in that which in law is already thus protected? How is the case with the other party, the judgment creditor, and his grantees? They are desirous of reaching money, property or rights in action of the judgment debtor; they must therefore become actors. If they found real property, their way was easy and clear; the lien of the judgment secures it. If personal, how is it then to be reached? Not by the docketing of a judgment; it is clear that does not reach personal estate. But it is claimed that the plaintiff, or his grantor, gave the defendant notice not to pay the unpaid balance on his contract to the person holding and owning it, and that the defendant was ignorant enough about his rights, to negotiate with them in relation to it. But how did that relieve the defendant from his liability on his contract, then legally held and owned by Boardman? Suppose he had paid the plaintiff what he demanded; how would that have relieved him from still paying Boardman? It is certainly a new doctrine of equity to insist that a notice upon the obligor is to operate with the effect of an injunction, or will prevent the obligee, or his legal assignee, from enforcing their obligations. Such notice certainly does not create a lien upon the money due. It is also claimed that John Lamb assigned this contract with knowledge of the docketing of the judgment; and that each subsequent assignee had like knowledge, and that they are not therefore purchasers in good faith. There was no such issue presented on the pleadings, or by the evidence. No such fact is found in the case, by the judge, nor is this an equity action, where that issue can be tried. The asssignees are not parties. On trial, their rights cannot be passed upon. But suppose it to be true, how would that affect the defendant? He did not know of the judgment, till after the property was advertised; and if he did, how would that relieve him from paying

Smith *v.* Gage.

his obligation to the owner of it? Such a notice set up, if he had been sued upon his obligation, would constitute no defense to him. The judgment creditor, who must be the moving party, comes more like an adventurer, or an intruder into this litigation, than the defendant. He, the creditor, had, it is doubtless true, a legal demand; he was attempting to enforce it fairly and legitimately in the courts; but with notice that the defendant had a higher and a prior lien. His diligence was proper and commendable, but he was bound to know the law; he had no equities against the defendant, and could impose no burthens on him; more diligence in another way would doubtless have accomplished his purpose. A creditor's bill, with an injunction restraining the executor of Anthony Lamb, and John Lamb the legatee, from paying over or assigning this legacy, or if he had already assigned, by making the assignees parties, and charging them with bad faith, would doubtless have secured to him this balance. It is not, however, our duty to search for, or point out to him, his remedies, any further than to show that in this case he had no remedy at law; though doubtless a perfect remedy in equity, and there *only*.

It is also argued, in order to show that this devise was *real* estate, that so much is the title of lands in the vendor in an executory contract, that he can bring ejectment to recover the possession, in default of the payments by the vendee. It is not necessary to deny this proposition, so far as it is used to work out a result. His right to bring his action, however, is not because he has the absolute legal title, and the vendee *none*, but because he has a lien, which, through the instrumentality of an action, he can make into a perfect title; that is, the vendee's title, as between the parties to the contract, is so far conditional that it is forfeited by default in payment. The action only lies when default in payment or condition is made, to obtain a judicial forfeiture of the vendee's title. But had the vendor severed his right to the money due, from his trust to convey, by a sale of the contract and the moneys due

thereon, his action of ejectment would not lie. So the right to bring the action depends not upon the vendor's title to it as real estate, but upon the default of the vendee in the payment of *money,* by which he forfeits title. So too, it is urged, that by the terms of the written contract the relation of landlord and tenant existed between the vendor and vendee, and that John Lamb by the will, succeeded to the estate of landlord of the premises. If such an anomalous or hermaphroditical instrument, or rather two different instruments in one, can exist in law as a contract to convey and a lease creating a tenancy, its character was changed by the assignment of the contract by John Lamb, who thereby severed the power in trust to convey from the contract of promise to pay the purchase money. The assignee of the promise had no title therewith to make him a landlord; and the holder of the naked trust, only, could have no rent due to him. This point, I think, is not sound. The judgment should be affirmed.

ROSEKRANS, J. concurred.

BOCKES, J. The law of this case has been already pronounced by this court on a former appeal, and by that decision we must abide, whatever may be our individual opinions. I entered my dissent at the time the decision was made. The decision was against my convictions, nor has a reconsideration of the case changed my views. Still I am as much concluded by that judgment as though I had yielded to it my assent. As I had occasion to remark in another case, similarly situated, "the former adjudication was a solemn annunciation of the law on the facts, and it must control until reversed by the court of appeals. The decision was made between the same parties, in the same action, on the same facts, after full argument and upon mature deliberation. It would therefore be anarchical to disregard or disturb it. Nor can it make any difference that the court is now differently constituted, as regards the persons who compose

it, from what it was when the decision was made. The law of the case is the same, and must be adhered to as already pronounced until reversed by the appellate court."

In obedience to the law as declared by the former decision, I directed the judgment from which this appeal is taken, and in further obedience thereto I must vote for an affirmance; at the same time I must be permitted to express my individual opinion against the correctness of the decision.

I shall not here elaborate my views, or attempt an argument. I will only very briefly state my convictions.

It was insisted on the former appeal that the McCoy judgment was without jurisdiction and void, and this objection is here again suggested. But the case shows that the summons in that action was personally served on the defendant, John Lamb, in the city of New York; that the action was on four promissory notes; and that the judgment was entered and docketed in due form. It appears, therefore, that the superior court had jurisdiction of the person and of the subject matter of the action, and the judgment was valid and binding. (*Code,* § 33, *sub.* 2.)

It was also urged, and still is, that the misrecital in the sheriff's deed of the name of Daniel instead of William McCoy, as plaintiff in the action against John Lamb, renders the plaintiff's chain of title incomplete. But such misrecital must be held quite immaterial. There was sufficient in the deed to identify the judgment and execution under which the sale was made, after rejecting the particular in which the recital was erroneous. The following cases are decisive of this objection. (5 *Cowen,* 529. 7 *id.* 13. 9 *id.* 182. 10 *John.* 382. 4 *Wend.* 585. 11 *id.* 422, 427. 18 *Barb.* 193, 201.)

The important question in the case, indeed the only one discussed on the argument of the appeal, is whether the McCoy judgment attached as a lien on the premises in controversy. The premises were originally owned by Anthony Lamb, who contracted to sell and convey them to the de-

fendant, Samuel Gage, reserving in terms his position as landlord and owner of the fee. Gage entered and remained in possession as vendee under the contract to purchase until Lamb's decease. At this time, and also at the time of the sale under the judgment and execution against John Lamb, there remained unpaid on the contract, a sum which on the 12th of July, 1859, amounted to $436.54. Anthony Lamb, by his will, devised the land and contract to his son John Lamb, with direction to him to carry the contract into effect. Thus John Lamb was made specific devisee, and became the owner of the fee, subject to Gage's rights under the contract of purchase; and the relation between him and Gage was that of vendor and purchaser under such contract. John took the same rights of property by virtue of the will *as if* his father had conveyed the premises to him by deed. If so, then it follows that the judgment against John Lamb became a lien on the premises, to the extent of the unpaid purchase money, and the purchaser under execution issued on the judgment would acquire John Lamb's interest.

In this way the plaintiff in this suit acquired the position of John Lamb in regard to the premises in controversy, which was in fact precisely the position held by the testator, Anthony Lamb, at the time of his decease. He was entitled to the unpaid purchase money, and on being paid according to the terms of the contract, was bound to execute to Gage, the purchaser, a deed of conveyance. (1 *Sandf.* 244. 11 *Wend.* 442. 17 *Barb.* 137. 3 *Kern.* 180.)

It is unnecessary here to decide any question between heirs and personal representatives, inasmuch as this is not a case of intestacy. Anthony Lamb left a will and testament, by which he devised these premises and the contract to his son John, who of course took as purchaser, the same as if his father had conveyed to him. The devise was a specific devise of both the land and contract; so there was no separation of the two estates or interests. In this regard this case is like *Parks* v. *Jackson*, (11 *Wend.* 442.) There

Samuel Franklin died, having devised the land (then in the possession of purchasers under contract of purchase with him) to his sons Abraham and John; and Hendricks the plaintiff, made title under judgments against them, the same as Smith in this case makes title under judgment against John Lamb. If, as is claimed to be the law, the judgments against Abraham and John Franklin did not attach as liens to the lands, because under contracts of sale made with their father, the testator, then Hendricks had no shadow of title whatever. But notwithstanding the case passed through the courts, from the circuit to the court of errors, it was not intimated that his title was not good because thus acquired and deduced. On the contrary it seems to have been taken for granted by the court and counsel that his title was sufficient to put the defendant to a defense on other grounds. The chancellor starts his opinion with the remark, that " if the conveyance to Henry Franklin was fraudulent, the judgments against Abraham Franklin and John Franklin were at the time of the commencement of the chancery suits *legal liens* upon the two thirds of the lots in question *devised to Abraham and John Franklin by the will of their father;* and a conveyance by the sheriff under execution upon those judgments would at that time *unquestionably have vested in the purchaser* at the sheriff's sale such a title as to enable him at law to recover from the persons then in possession, under the contract of purchase." Notwithstanding these remarks occurred in the dissenting opinion, they were accepted as sound in principle, and the examination of the case in the supreme court and in the court of errors proceeded on the hypothesis that a judgment against a devisee of lands held under a contract of purchase made with the testator becomes a lien thereon. It is true equity will limit and control the lien, being a general lien, so as to protect the equitable rights of third persons under the contract who act in good faith. In this case, if Gage had paid the balance remaining unpaid of the purchase price to John Lamb, in good faith and without

notice of the judgment lien, it would have been deemed a good performance of the contract, and he would be protected in his title notwithstanding the judgment. But instead of paying in good faith and without notice, he was informed of the plaintiff's rights, after which and putting him at defiance, he undertook to settle and arrange with the assignee of John Lamb, which was in law the same, as regards his rights, as if he had undertaken to settle and arrange with John Lamb himself; for an assignee of a chose in action stands in exactly the same situation as the assignor, as to the equities arising upon it. (18 *Law and Eq. Rep.* 82. 24 *How.* 44. 22 *N. Y. Rep.* 535.)

So if he had paid to the executor of Anthony Lamb in good faith, supposing that the money was necessary to meet the expenses of due administration, the executor having made claim to the money for that purpose, he would perhaps have been protected in the payment. And in case the money was not exhausted in the payment of the debts of the testator, or in case it should be afterwards found that there were other funds which should be applied thereto instead, the owner of the legal title might have his claim against the executor therefor. (2 *Comst.* 397.) In this case the money was not paid to or claimed by the executor; nor is it pretended that it should have any other application than in satisfaction of the specific direction given it by the will. The devise must therefore be deemed to have the assent of the executors. So far as we can see from the case before us the executor had no claim upon it, or duty to perform in regard to it, and the right to the unpaid purchase money remained with the person in whom the legal title to the land was vested.

It is said that there was an equitable conversion of the land into money by the contract of sale. This was undoubtedly so; but only for the purpose of securing to the parties their equitable and just rights. This is the foundation of the doctrine of equitable conversion, which can only be invoked for the purpose of preserving an equity. There being

Smith *v.* Gage.

no equity to prevent that result, a judgment against a vendee of lands who has contracted to convey becomes a lien thereon to the extent of the unpaid purchase money. It is so decided in numerous cases. And there being no equity to prevent it, a judgment against a devisee of lands, under a contract of sale made with the testator, becomes a lien also, to the same extent. So again, *if there be no equity to prevent it,* a judgment against the heir at law of an intestate who has contracted to sell the lands will become a lien thereon. I say this with all due deference to the decision in *Adams* v. *Green,* (34 *Barb.* 176.) Suppose the case of a single devisee or single heir, and also suppose there are no debts of the executor, or sufficient personal property to satisfy them; would not a judgment against the heir or devisee attach, the same as it would if recovered against the testator or intestate after he had agreed to convey? In case of a devisee of lands which Lamb here contracted to be sold by the testator but not conveyed, equity will not permit the lien to the prejudice of the rights of the executor; nor, in case of intestacy, will equity allow the lien of the judgment against the heir without recognizing and protecting the right of all parties interested in the subject matter and avails of the contract.

It is said that the interest of the vendor, after the contract of sale, is personal property. But a judgment, as we have seen, will attach to the lands agreed to be conveyed, in case the whole purchase money is not paid. So it is said that on the decease of the vendee, the money remaining due and unpaid on the contract will go to his personal representatives. Undoubtedly in case the contract be afterward performed, except in case of a specific devise. But what will be the condition of the property in case of a forfeiture of the contract? Will it not then go to the devisee or descend to the heir at law?

It seems very clear to me that Hinsdale, by the sheriff's deed, obtained the legal title to the lands subject to the contract with Gage, and the plaintiff acquired his position and

right by virtue of the conveyance from Hinsdale. The plaintiff's title related back and took effect from the date of the lien of the judgment, and overreached the supposed rights of those claiming from or under John Lamb, by sale and conveyance subsequent to the lien. So the plaintiff having acquired the position and rights of Anthony Lamb at the time of his decease, the relation between him and Samuel Gage was that of vendor and purchaser. The plaintiff had a right to the premises unless Gage should perform the contract of purchase, and Gage could tender performance to the plaintiff. The legal relation between the plaintiff and Gage being that of vendor and purchaser, Gage was not entitled to notice to quit before suit. (3 *Barb.* 576. 5 *Wend.* 26. 21 *id.* 230. 22 *id.* 605. 7 *Cowen,* 747.)

But the decision of the case is a foregone conclusion, to which I must yield obedience.

The judgment must be affirmed.

JAMES, J. This case comes before us for the second time. On the first trial the plaintiff had a judgment, and on appeal, before Justices ROSEKRANS, POTTER and BOOKES, the latter dissenting, the judgment was reversed and a new trial ordered. On the second trial the plaintiff proved, in addition to what was shown on the former trial, that the defendant had knowledge of the plaintiff's title before service, during their contract and taking a deed from John Lamb, and giving a bond and mortagage back for the balance of the purchase money. I regard that as an important fact, and so far distinguishing the case from what it was when formerly before the court, as to exempt it from the rule of *res judicata.* I think it may be re-examined.

The principal question in this case is the one first determined by the court below. It is whether or not the judgment in favor of McCoy against John Lamb, under and through which the plaintiff claims title, ever became a lien upon the premises herein sought to be recovered. If it did,

then the judgment below must be reversed; otherwise it must be affirmed.

It may not be inappropriate to first consider what would be the rights of the plaintiff had this judgment been against Anthony Lamb, docketed after the contract, and a sale and purchase before his death.

An agreement for the sale of land is a personal contract; it does not attach to the land sold, nor divest the vendor of his estate. The legal title still remains in him, and he could convey to a *bona fide* purchaser without notice and for value, a title to the premises, freed from the equity of the vendee. A judgment against the vendor would be a lien upon the land, to the extent of his interest. (2 *R. S.* 256, § 3. *Parks* v. *Jackson,* 11 *Wend.* 447.) A judgment against the vendee would not be a lien upon such land, (1 *R. S.* 744, § 4,) because under such contract no legal estate vested in the vendee upon which the judgment could attach, or which could in any way be reached by process of law. (*Story's Eq.* § 790. *Bogart* v. *Perry,* 1 *John. Ch.* 52. 17 *John.* 351.)

A judgment from the date of its docketing becomes a charge upon all the real estate whereof the judgment debtor at the time had the legal title in his own right, and the judgment creditor has at law the right to acquire that title by sale and purchase, under execution. (*Moyer* v. *Hinman,* 13 *N. Y. Rep.* 184.) After such sale, and the expiration of the period of redemption, if no redemption take place, the purchaser becomes possessed of the title and all the interest held by the judgment debtor at the time of docketing the judgment, subject to the same equities that then existed against him, or which may have arisen since, through want of knowledge of such judgments. (*Keirsted* v. *Avery,* 4 *Paige,* 15. *Ten Eick* v. *Simpson,* 1 *Sand. Ch.* 244. *Parks* v. *Jackson,* 11 *Wend.* 442. *Governeur* v. *Lynch,* 2 *Paige,* 300.) The vendee of a previous contract of sale of such premises from the judgment debtor, upon performance of the contract may compel a conveyance from the purchaser.

Such being the law, it is certain that had the judgment, under and through which the plaintiff claims title to the premises in controversy, been against Anthony Lamb, obtained after the contract to Gage, the plaintiff would have the legal title to said premises and a legal estate therein equal to the unpaid purchase money due on the contract; and that Gage's refusal to pay that balance as shown upon the trial, would have entitled the plaintiff to a judgment for the possession of the land. (*Parks* v. *Jackson*, 11 *Wend.* 449.)

Upon the death of Anthony Lamb, the legal title to the estate, and his interest in the contract, passed to John Lamb, by the devise in the will of Anthony Lamb. This devise was not in trust, nor did it create, or intend to create a trust. It gave the title and all the estate and interest of the testator in and to the land, and the benefits arising from the contract of sale to the devisee, imposing only an obligation to convey in case the contract was performed by the vendee. John Lamb's estate was such that he could have conveyed to a third person, not having actual or constructive notice of the contract, a good title to the lot.

Can there be a doubt that John Lamb would have had an estate in fee to this land, had Gage become insolvent or refused to perform, and the contract become forfeit? Such acts would surely free it from the equity arising under the contract and leave the legal title in him, discharged of all such equities, to the vendee. (*Sanders* v. *Aldrich*, 25 *Barb.* 71, 72, *affirmed in the court of appeals, December*, 1861.) Surely then, a judgment docketed against John Lamb, while he held the legal title and the vendor's interest in the contract of sale, would become a charge on premises so held by such title, even though subject to the equity of the vendee.

It is insisted by the defendants that John Lamb, by the will of his father, merely became the trustee of the defendant's title to the land. It seems to me that the will itself gives no warrant for any such construction; on the contrary its language leads to an entirely different conclusion.

Smith *v.* Gage.

This view is sought to be sustained by the application of the doctrine of equitable conversion. It is claimed that under this doctrine the vendor in a contract for the sale of land, if the vendee enter into possession and make improvements, becomes a trustee for the vendee as to the land, and the vendee a trustee for the vendor as to the purchase money, and until payment the vendor has but a mere lien on the land as a security for the purchase money. This rule is often thus broadly stated in the books, yet I doubt if any case can be found fully sustaining it as thus stated. The rule as it in fact exists is based on the equitable fiction of treating the contract as if specifically executed, and the vendee the equitable owner of the land and the vendor the equitable owner of the purchase money, thereby creating an implied trust in the vendor as standing seised for the vendee's benefit. It is very doubtful if this doctrine of equitable conversion has any application whatever to a contract for the sale of land until full payment is made of the purchase money. (*Bogert* v. *Perry*, 17 *John*, 354, 355.) But if it has it cannot be extended and applied beyond the amount of purchase money actually paid. (*Griffith* v. *Beecher*, 10 *Barb.* 434, *and authorities there cited. See Hand's opinion, Moyer* v. *Hinman*, 3 *Kern.* 189.) Although such a construction may be a novelty in law, and without any reason to support it, I think it certain that beyond the interest created by actual payment, the vendor has the legal as well as equitable title to the land, of which no fiction of equity can or will deprive him. Again, in cases subject to its application, this fiction is only invoked to do equity and promote justice, never to overcome a prior legal right, of equal equity, as is sought for it in this case.

The equitable rule of descents, based also on the doctrine of equitable conversion, is invoked to show that the intent of the testator by his will was simply to make the devisee therein the trustee of the title. That rule is this: where a contract for the sale of land is entered into and the vendee pays part down and enters into possession, and either dies

without will, the vendee's interest in the contract passes to his heir as land, and that of the vendor to his personal representatives. So far as this rule touches the several *interests* of the respective parties it is perfectly just and in accordance with well established principles; that is, when the balance of the purchase money is paid, the land descends to the heirs of the vendee and the money passes to the personal representatives of the vendor. But until paid, no change of title takes place; the heir of the vendee cannot obtain the title, nor the personal representatives the money or the land. Suppose on the death of the vendor the vendee should prove insolvent and the contract remain unpaid whereby it becomes forfeit, would the vendor's personal representatives be entitled to a conveyance from his heir? I think not. He could not be called upon to convey until the purchase money was paid, (*Moon* v. *Burrows*, 34 *Barb.* 175;) and holding the legal title subject only to the vendee's equity under the contract, by its forfeiture the land becomes freed from that equity, and he possessed of the whole estate. The personal representatives being entitled to the unpaid purchase money only, have no equitable claim to the whole estate as against him. (*Sanders* v. *Aldrich*, 25 *Barb.* 71, 72. *See Story's Eq.* §§ 12, 14.)

I cannot perceive that the doctrine invoked aids at all in ascertaining the intent of the testator, unless it be that being aware of the equity rule, if he died intestate, he sought by his will to prevent its application to his estate, by placing the legal title and beneficial interests in the hands of his son, so that upon his death his son would stand precisely in his shoes, both as to the land and the contract.

In the hands of the vendor the contract was a chattel capable of sale and assignment, separate from the land. In such case the assignee would be entitled to receive and enforce the payments on the contract, but would have no interest in or lien upon the land. If before the assignment a judgment had been obtained against the vendor, it would have been a lien upon the land to the extent of the unpaid

balance on the contract. A sale and conveyance under such judgment, and notice to the vendee, would entitle the purchaser under the judgment to the payment of the unpaid purchase money from such vendee, notwithstanding the assignment by the vendor of the contract to a third person. Equity would prevent such assignee from enforcing payment of such contract against the vendee, because the assignee took the contract subject to all the equities existing against his assignor, even though he had no knowledge of such equities. (*Mangles* v. *Dixon*, 18 *Eng. L. and Eq. Rep.* 82, *and cases cited.*) As I have before attempted to show, John Lamb, as the owner of the beneficial interest in the contract, and the holder of the legal title, stood precisely in the place of his ancestor. This being so, the judgment under and through which the plaintiff claims title to the estate became a lien on the land, for the unpaid balance of the purchase money, immediately on the docketing of the judgment in the county where the land was situate, after the death of the testator. In this case that was while John held the contract.

The lien of the judgment against John Lamb having attached to the land, before the assignment by Lamb of his interest in the contract, the assignees thereof took it subject to such lien. Upon the sale and conveyance of such land, by the sheriff, under and by virtue of the execution issued upon the McCoy judgments, the plaintiff, as the grantee of the purchaser thereof, upon notice to Gage, was entitled to the balance unpaid of the purchase money on the contract of sale, or in default thereof, the possession of the premises. Payment of the contract by Gage to the assignees, after notice of the title derived from the sheriff's sale, was in his own wrong and did not entitle him to a conveyance from the purchaser under the sheriff's sale. After such sale John Lamb had no title or interest in the land, and hence could give none by his deed.

The legal title to the premises in controversy was, at the time this action was commenced, in the plaintiff; the con-

tract had become forfeit, and hence the plaintiff was entitled to recover the possession of the land described in the complaint.

In my opinion the judgment below should be reversed and a new trial granted; with costs to abide the event.

Judgment affirmed.

[WARREN GENERAL TERM, July 14, 1863. *Rosekrans, Potter* and *Bockes,* Justices.]